In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 13-2814, 13-3469

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KEON THOMAS and STYLES TAYLOR,

*Defendants-Appellants*.

Appeals from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 01 CR 73 — **James T. Moody**, *Judge*.

ARGUED APRIL 22, 2015 — DECIDED JULY 20, 2015

Before POSNER and KANNE, *Circuit Judges*, and DARRAH,
*District Judge*.[*]

POSNER, *Circuit Judge*. In 2000 an almost totally deaf 73-year-old, the federally licensed owner of a gun store in Hammond, Indiana, was shot to death and the store robbed of many of its guns. Taylor and Thomas, the appellants, were indicted for the murder and robbery and in 2004 con-

_____

[*] Of the Northern District of Illinois, sitting by designation.

victed by a jury of a variety of federal crimes, including murder in the course of a robbery, and were sentenced to life in prison. The convictions were vacated in 2011 because of a possible violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), arising from the government's striking a black juror in the first trial. *United States v. Taylor*, 636 F.3d 901 (7th Cir. 2011). Retried in 2012, both defendants were again convicted and again sentenced to life imprisonment.

The defendants were drug dealers in Hammond. Their drug dealing was not yielding them significant profits, and they discussed robbery as a way of increasing their income. Plaster casts of tire tracks next to the gun store, made by the police shortly after the murder was discovered, indicated that the tracks could have been created by Thomas's Cadillac. And a couple of days after the murder Taylor told a 14-year-old girl named Precious Walker that he and a man named Bud White had killed the proprietor of the gun store and taken guns from the store. Taylor made a similar confession to a jeweler.

As a result of searches, and a seizure of guns during a traffic stop, a number of guns stolen from the gun store during the robbery were traced to Taylor and Thomas. Thomas admitted to investigators that the Cadillac that had been used in the robbery was his, though he denied his own involvement in the murder or robbery.

At trial the government called Montrell, Taylor's brother, who had turned 15 shortly after the murder, as a witness. Admitting that he would lie or die for his brother, Montrell testified that neither Taylor nor Thomas had ever confessed to him about being involved in the murder or robbery. But this testimony, the government established, was contrary to

testimony that Montrell had given both at the first trial and at grand jury hearings in 2001 and 2003. Transcripts of his earlier testimony were admitted into evidence pursuant to Fed. R. Evid. 801(d)(1), which allows the admission of a witness's prior inconsistent testimony given under oath.

Montrell had been interviewed by police shortly after the murder and robbery. Asked at the second trial about the discrepancies between what he had told the officers at the interview and his current testimony, he said they'd used threats to get him to give testimony implicating his brother in the murder and robbery—threats such as that he would be put in solitary confinement, or even subjected to the death penalty, for having been involved in the robbery. He added that only after he'd agreed to tell the interrogators what they wanted him to tell them did they tape his statement. Yet he'd signed a waiver of rights form, and one of the interrogators testified that Montrell had not been threatened and that the statements he made before the recording began were generally consistent with his recorded statements. The judge ruled that the videotape of the interrogation, which included such statements by Montrell as that his brother had told him that he had "hit a lick" and "had to kill the gun store man, but I got a gank of guns," was admissible to impeach Montrell's testimony at the current trial.

An adult by the time of this trial, Montrell was free to testify and did testify that he had been coerced in his initial interview back in 2001, and his lawyer was free to and did point to the failure of the police to record the entire interview as a suspicious circumstance; for presumably had they threatened him the threats would have preceded the admissions and they would have wanted only the admissions rec-

orded. If the statement made by Montrell was coerced and demonstrably unreliable, and its admission in evidence in the present case could not be found to be a harmless error, the defendants would be entitled to a new trial. See *Arizona v. Fulminante*, 499 U.S. 279, 306–12 (1991); *Samuel v. Frank*, 525 F.3d 566, 569 (7th Cir. 2008); *Buckley v. Fitzsimmons*, 20 F.3d 789, 794–95 (7th Cir. 1994). Only the argument that the statement was coerced has any possible merit, however, and that argument is based entirely on Montrell's testimony, which conflicts not only with his interrogator's testimony but also with sworn statements that Montrell had given before the 2012 trial. Those statements were consistent with the statements on the videotape and had not been coerced.

Fear of perjury charges, which Montrell claims drove him to give sworn testimony that matched his initial interview, is not coercion. *Sawyer v. Mullaney*, 510 F.2d 1220, 1221 (1st Cir. 1975); *Hinton v. Uchtman*, 395 F.3d 810, 822 (7th Cir. 2005) (concurring opinion); *United States v. Collazo*, 798 F. Supp. 513, 518 (N.D. Ind. 1992). Otherwise a person who perjured himself would acquire a license to repeat the perjured statement indefinitely, since for him to tell the truth would amount to confessing to the perjury. As for the videotaped statement that Montrell claimed had been coerced, it was admitted only for the purpose of impeaching (that is, contradicting or undermining) his testimony at trial, and it was consistent with other witnesses' reports of Taylor's confessions as well as with other evidence presented by the prosecution.

Arthur Vibanco, 12 years old at the time of the robbery, lived next door to the gun store. In their opening statements the defendants' lawyers told the jury that the defense would

call Vibanco to testify because he had been "an eyewitness to this crime"; that he would testify that he had seen five men in a Cadillac enter the store, heard two shots, and seen the men leave and get back into the Cadillac; that his description of the Cadillac would prove that it had no connection with either Thomas or Taylor but rather with Charles "Bud" White; and that Thomas was not one of the men seen exiting and later reentering the car.

Taylor's lawyer did call Vibanco, but as a witness for the defense he proved to be a dud. He testified to having memory problems, and that he remembered nothing about the crime. Yet shortly after the crime he had been interviewed by police, and the defense proposed to introduce the police report of that interview as evidence of his description of the Cadillac that he claimed to have seen at the scene of the crime. The police had distributed a flyer asking the public whether anyone knew of a Cadillac answering to the description that the police report attributed to Vibanco. This was the description, it appears, to which Taylor's lawyer was alluding when he gave the jury his preview of Vibanco's testimony.

At this juncture the court recessed the trial for the night and during the recess the prosecutor reminded Taylor's lawyer that his client had given the government a "proffer" (a statement given to the government by a criminal suspect or defendant as a possible basis for a plea agreement that will enable him to receive a lighter sentence than if he insists on a trial and is convicted) admitting that he was in Thomas's Cadillac at the robbery scene and knew the robbery was taking place. The terms of the proffer permitted the prosecution to use it against Taylor if he presented evidence incon-

sistent with it; and so if Vibanco's description of the Cadillac was placed in evidence by the defense the prosecution would be allowed to use the proffer to rebut it. The defense lawyers' response was to ask that Vibanco's testimony be stricken, which it was, and to rescind their offer of the police report of his statement.

That was not to be the last word about Vibanco. For in closing argument the prosecutor said, without objection by defense counsel, "I really don't know what the defendants were gonna talk about in their opening about Mr. Vibanco seeing some other car there; but, obviously, that never came to fruition. So—even Keon Thomas admitted his car was there." We can't see what was objectionable in the prosecutor's statement, and the defense did not object to it. Thomas had indeed admitted—independently of Taylor's proffer—that his car was there even though he denied that he was involved in the crimes. Since the defense had claimed in its opening statements that Vibanco had seen a car at the gun store that was not Thomas's, it was permissible for the prosecution to point out that the defense had offered no evidence in support of that theory.

The defense makes much of the prosecutor's brief examination of Tjorra Payton, Taylor's girlfriend at the time of the crime. The prosecutor asked her whether shortly after the crime she had found a gun in her laundry basket; if so it probably had been hidden there by Taylor. She testified that she had no recollection of it. Yet she had testified before the grand jury that she had found the gun there. The judge refused to admit the transcript of her grand jury testimony, which was error, because grand jury testimony is admissible as evidence when the witness has no recollection of it. Fed.

R. Evid. 801(d)(1)(A); *United States v. Cooper*, 767 F.3d 721, 728 (7th Cir. 2014). The government then showed her a transcript of her testimony and asked her whether it refreshed her recollection. She said it didn't. The government pressed her, saying "You still have no memory of finding a gun in your hamper?" and "Do you have any memory of confronting Styles Taylor and telling him to get the gun out of your apartment?" After she again denied any recollection, the matter was dropped.

The defendants argue that it was improper for the government to call Payton at all because it knew before the trial began that she claimed to have no memory of the events. But the government could call her in order to introduce her grand jury testimony in evidence, consistently with Rule 801(d)(1)(A), as explained above, should she deny having any recollection of that testimony.

The defendants also complain that the government insinuated that Payton had testified to the grand jury that she'd found the gun—as indeed she had. While in other circumstances the government's asking Payton questions about what she remembered of her prior statement after she said that reviewing that statement had not refreshed her memory would be an improper tactic because indicative of what her prior statement had been, it was not an improper tactic in this case because her grand jury testimony was as we said admissible in evidence.

The son of the owner of the gun store was a Hammond firefighter, and one of the jurors was a former fire chief of East Chicago, which is adjacent to Hammond. Several firefighters had been among the first responders to the murder, and one of them gave brief testimony about what he had

found when he arrived. The victim's son, who had been summoned to the scene, also testified. There were no objections to the testimony of the two firefighters. Nor were there any objections to the presence, at the closing argument, of about twenty uniformed firefighters in the audience section of the courtroom. But after the jury returned the guilty verdicts, defense counsel moved for a new trial on the ground that the presence of the uniformed firefighters had deprived the defendants of a fair trial.

The judge denied the motion. He was justified in doing so, quite apart from the failure of the defendants to have made a timely objection to the presence of the firefighters, though the defendants (and their counsel) were aware of their presence. The prosecutor had made no reference to the firefighters in closing argument. Nor is there any suggestion that they fidgeted, made faces, or in any way disrupted the trial, impaired its decorum, or detracted from its gravity. It is not suggested that their presence was a prosecutorial ploy, or that they were present for any reason other than that the murder victim had been the father of one of them. And for all we know the only reason they were wearing their uniforms was that they were taking a brief break from duty to hear the closing arguments. Defense counsel do not even tell us how large the courtroom is, how many spectators it seats, and what fraction of the audience consisted of the uniformed firefighters.

The defendants haven't made a case for intimidation or improper influence of the jury. As pointed out in *Smith v. Farley*, 59 F.3d 659, 664 (7th Cir. 1995), "if you kill a policeman and are put on trial for the crime, you must expect the courtroom audience to include policemen," and if one re-

places "policeman" with "firefighter's father" and "police-men" with "firefighters," this case involves a similar expectation. In *Smith* we upheld the defendant's death sentence, and in *Carey v. Musladin*, 549 U.S. 70, 77 (2006), the Supreme Court ruled that it had not violated the defendant's right to a fair trial for the court to have allowed members of the victim's family to attend the trial while wearing buttons displaying the victim's picture. It's true that in *Woods v. Dugger*, 923 F.2d 1454, 1458–59 (11th Cir. 1991), the defendant's murder conviction was overturned in part because of the number of uniformed prison guards who attended the trial, but the decision was also based on the fact that the victim was a prison guard killed while on duty, that there was extensive pretrial publicity about dangers to prison guards, and that several jurors had relatives employed in the prison system.

We turn now to the defendants' challenges to their sentences of life imprisonment. (As in *United States v. Vance*, 764 F.3d 667, 676–77 (7th Cir. 2014), the judge in this case imposed a term of supervised release on the defendants, which since supervised release doesn't begin until the defendant is released from prison will become moot if they die in prison, as they will unless their lifetime prison sentences are commuted.) Among other things they contest the judge's adding two guideline levels for their having attacked a "vulnerable victim." U.S.S.G. § 3A1.1(b)(1). The government points out that because the defendants' guideline score was the maximum, 43, without the enhancement, and life imprisonment is recommended for convicted defendants having such a score, the enhancement is unlikely to have affected their sentence. But it could have. A recommendation is not a command, and so a lower score might have influenced the judge's choice of sentence. There is also the possibility, re-

mote though it may be, of either a successful bid for a post-conviction remedy or a pardon. (The possibility that a life sentence based on a guidelines score of 43 might be converted to a sentence of years were there no basis for a vulnerable-victim or other enhancement suggests a need to reexamine cases such as *United States v. Fletcher*, 763 F.3d 711, 717–18 (7th Cir. 2014), that have held that a guideline error is harmless if it doesn't affect the defendant's guideline range.)

A defendant, to be given the vulnerable-victim enhancement, must have been, or at least should have been, aware of his victim's vulnerability. U.S.S.G. § 3A1.1(b)(1) ("knew or should have known that a victim of the offense was a vulnerable victim"). The defendants argue that they didn't know their victim was deaf and wore a pacemaker (though the relevance of the pacemaker to his vulnerability is unclear), and that they shot him merely because he reached for a gun, and would have done so whatever his age or impairments. But as is apparent from the language of the guideline authorizing the enhancement, the crime need not have been *motivated* by the victim's vulnerability. The judge was entitled to find that the defendants probably did know, and certainly should have known, of their victim's vulnerability, and that's enough for the enhancement. The gun store they entered was not the only one in Hammond, and they may have picked it because they were aware of the owner's vulnerability. As soon as they entered they would have seen that he was elderly, and they may well have noticed that he didn't hear them enter because, although the door had a loud electronic buzzer connected to it, he couldn't hear it, because of his deafness.

The judge gave both defendants a guideline enhancement for obstruction of justice, and Taylor challenges his enhancement on this appeal. The challenge fails. He obstructed justice by threatening a witness (Precious Walker)—he confessed the crime to her and told her he'd kill her if she told anyone.

By way of further challenge to their sentences the defendants argue that they had had such awful upbringings, which jointly with their personal characteristics were responsible for their criminality, that they should have been given shorter sentences. Taylor asked the judge to impose a sentence of 25 years on him, which because he's been imprisoned since his arrest in 2000 would entitle him to be released in 10 years (less if he gets time off for good behavior), when he will be about to turn 45. Thomas requested a sentence of 30 years, which would entitle him to be released in 15 years, when he'll be almost 56. And upon release the defendants will face five years of supervised release, restricting their conduct and precipitating revocation and a prison sentence should they disobey any of the conditions of supervised release.

In sentencing each defendant to life imprisonment the judge recited just boilerplate—that a lower than guidelines sentence, "as requested by the defendant, is just not warranted under the facts and circumstances of this case. … This sentence reflects the seriousness of the offenses, promotes respect for the law, and provides just punishment for these crimes. It is sufficient but not greater than necessary to hold this defendant accountable for his criminal conduct." See 18 U.S.C. § 3553(a). And so on in this vein. The judge said nothing about the history and characteristics of either defendant.

This was a potentially serious omission because a sentencing judge's failure to address a defendant's substantial argument for mitigation of his sentence can require resentencing, see, e.g., *United States v. Gary*, 613 F.3d 706, 709 (7th Cir. 2010), though the emphasis falls on "substantial."

Taylor had been born in 1980 to an unmarried woman who did not want to have a child. When pregnant with him she indulged in heavy drinking and consumption of marijuana and cocaine, and drank rum with quinine capsules in order to kill the fetus. Obviously he survived, but he was born three months early, weighing only about three and a half pounds. His mother made clear that she cared only about her other children, beat him gratuitously, blew marijuana smoke in his face to calm him down, and abandoned him for long periods. An aunt beat him routinely, including with extension cords and belts—instruments also used by his mother to beat him. He bore scars from the beatings. His mother abused him verbally as well, calling him "little son of a bitch," "little motherfucker," and "bastard" (which literally he was, but that wasn't the sense in which his mother was using the word). Throughout his childhood his mother smoked crack cocaine and consumed quantities of cocaine, marijuana, and alcohol, as well, including in his presence. Her home—which was his home—was a well-known site for gambling and prostitution.

Left largely to himself, Taylor by the age of four was being used by adults to help them commit burglaries. Teenagers in the neighborhood introduced him to gambling and drug dealing when he was eight years old. A different aunt, and his grandmother, made valiant efforts to take care of him but both were dead of cancer by the time he was in his

teens. He was a terrible student, with cognitive difficulties that may have been related to his mother's heavy drinking during her pregnancy. At age 11 he was convicted of burglary, at 16 of armed robbery, and at 18 of possession of illegal drugs, though he was jailed for only two days for the drug offense. He was as we said 19 when he participated in the murder of the gun store's owner and the robbery of the store's guns.

The facts regarding Taylor's personal history, if true (they have not yet been submitted to full evidentiary procedure), are possible grounds for mitigation—for reducing his sentence from life to a term of years. For they suggest that external forces beyond his ability to control created cognitive and psychological impairments that greatly diminished his ability to resist engaging in serious criminal activity. When substantial grounds for mitigation are presented, the sentencing judge must explain his reasons for rejecting them, see, e.g., *United States v. Morris*, 775 F.3d 882, 886–88 (7th Cir. 2015), and this the judge failed to do. The government agrees that Taylor's sentence must therefore be vacated and the case remanded for resentencing. Although Thomas's upbringing was not as awful as Taylor's, it was similar enough to persuade the government that he too is entitled to be resentenced. In all other respects (including rulings that we have not discussed because the defendants' challenges to them are plainly devoid of merit) the judgments are affirmed.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED