**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 9, 2016
Decided October 7, 2016

**Before**

WILLIAM J. BAUER, *Circuit Judge*

RICHARD A. POSNER, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 16-1527

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 13 CR 916 |
| HARVEY WRIGHT, *Defendant-Appellant*. | Thomas M. Durkin, *Judge*. |

**O R D E R**

Indicted for his role in a mortgage-fraud scheme, Harvey Wright pleaded guilty to one count of wire fraud, *see* 18 U.S.C. § 1343, and was sentenced below the guidelines to 34 months' imprisonment. Wright challenges his sentence on appeal, arguing that the district court misapplied the factors listed in 18 U.S.C. § 3553(a) and failed to adequately justify the length of the sentence. We affirm.

We present the facts as they are summarized in Wright's plea agreement. In 2008 and 2009, Wright, then a licensed attorney,[1] worked with a Chicago-area title company engaged in a mortgage-fraud scheme. The scheme involved "double closings"—transactions in which Wright and the title company orchestrated the purchase of distressed properties and their immediate resale at fraudulently inflated prices. Wright first would obtain a short-term loan for a straw buyer, who would immediately flip the property and sell it at a much higher price to a second straw buyer, whom Wright also directed and on whose behalf secured the mortgage loan to finance the sale. To obtain the mortgage loan, Wright would hide the nature of the scheme by making false representations on sale-related documents. The mortgage loan would then be used to pay back both the first buyer's short-term loan and the second buyer's down payment, and a remaining portion would go to Wright. The second straw buyer had no intention of making any payments on the outstanding mortgage obligation, resulting in a loss for the lender. Wright was involved in three double closings, all of which concerned properties on Chicago's south side.

A grand jury charged Wright with two counts of wire fraud for his role in the scheme, and he pleaded guilty to one of those counts.

A probation officer calculated a guidelines range of 41 to 51 months, based on a total offense level of 22 and a criminal-history category of I. On top of a base offense level of 7, U.S.S.G. § 2B1.1(a)(1), Wright received a 14-level increase for the amount of loss attributed to the scheme ($630,430), *id.* § 2B1.1(b)(1)(H), and two-level increases apiece for use of sophisticated means in committing the offense, *id.* § 2B1.1(b)(10)(C), and misuse of a position of trust as well as his special skills as a licensed attorney, *id.* § 3B1.3, minus three levels for acceptance of responsibility, *id.* § 3E1.1. The district judge accepted the probation officer's calculations.

The judge sentenced Wright below the guidelines to 34 months' imprisonment. He described the scheme as "intricate and detailed"—given the involvement of a corrupt title company and the assistance of a real-estate lawyer (Wright)—and said that it amounted to stealing from "hoodwinked" banks—albeit "with pens, not with guns . . . with phony documents, not with masks." The judge also remarked that Wright's role involved planning and reflection over repeated transactions and that his use of his legal training potentially enabled the participating non-lawyers to believe that

---

[1] He was disbarred in 2011 for unspecified reasons, according to the presentence investigation report.

their actions were lawful. The judge highlighted that the properties involved all were "in neighborhoods like Englewood … . [N]eighborhoods that can ill afford to have people preying on the system," in contrast to wealthier areas: "Nobody does this in Oak Brook or in Hinsdale or in Wilmette or Highland Park." The judge added that Wright's good upbringing and higher-education degrees made it all the more inexcusable that he would devote himself to a scheme that was "crooked from the start."

In challenging his sentence, Wright argues first that the district court erred in its § 3553(a) analysis by considering circumstances such as the sophistication of the scheme and his background as a lawyer. In Wright's view, these circumstances already were taken into account in the court's calculation of his guidelines range when his offense level was increased two levels for the use of sophisticated means and another two levels for his misuse of a position of trust and his legal training.

But matters such as a scheme's sophistication and a defendant's status as a lawyer both fall squarely within the factors set forth in § 3553(a)(1). And because Congress instructed both the Sentencing Commission and the sentencing judge to carry out the objectives of § 3553(a), overlap between the guidelines calculation and the sentencing judge's consideration of those factors is to be expected. *Rita v. United States*, 551 U.S. 338, 347–48 (2007); *see United States v. Maisonet-González*, 785 F.3d 757, 764 (1st Cir. 2015); *United States v. Brantley*, 537 F.3d 347, 350 (5th Cir. 2008). In any case, in justifying the sentence, the judge discussed the individual circumstances of Wright's offense and relied on other facts contemplated under the guidelines—e.g., the number of separate transactions that Wright assisted, the poverty of the communities harmed by the scheme, and the level of Wright's involvement compared to that of other participants.

Wright also questions the court's reliance on the facts that he enjoyed a "good upbringing" and that he was able to graduate from college and law school. But one's upbringing, by definition, is part of one's history and characteristics. *See* 18 U.S.C. § 3553(a)(1); *United States v. Maday*, 799 F.3d 776, 779 (7th Cir. 2015); *United States v. Thomas*, 794 F.3d 705, 712–13 (7th Cir. 2015). And while one's upbringing can be a mitigating factor for a defendant who is pressured to choose crime by dire circumstances, Wright, as the court appropriately pointed out, was not so influenced. *See United States v. Fogle*, 825 F.3d 354, 359 (7th Cir. 2016); *United States v. Kluger*, 722 F.3d 549, 568 (3d Cir. 2013) (defendant's "loving and supportive family [and] privileged childhood" were part of "history and characteristics"). Wright offers no reason why Judge Durkin's reliance on this factor was "undue," particularly when a

below-guidelines sentence is presumed reasonable on appeal. *See United States v. Jackson*, 598 F.3d 340, 345 (7th Cir. 2010).

Wright relatedly argues that the court should not have considered the impoverished location of the affected properties. Wright disputes the court's statements that all of the properties were located in poor neighborhoods like Englewood, that he and his fellow participants targeted those areas intentionally, and that similar schemes do not take place in more affluent suburbs. But the factual basis in the plea agreement lists the addresses of the three affected properties; two of them are in West Englewood, and the other is in another south-side neighborhood, Back of the Yards. Although the judge did not substantiate his view that Wright intentionally targeted poor areas or that these sorts of schemes do not take place in wealthy suburbs, his larger point was that Wright's crime affected areas that could ill-afford the collateral damage of the scheme, namely, more foreclosed properties. Wright does not explain why this was an inappropriate consideration.

AFFIRMED.